UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Mark Bellerose**

    **v.**

**SAU #39**

Case No. 13-cv-404-PB
Opinion No. 2014 DNH 265

MEMORANDUM AND ORDER

Mark Bellerose, a former custodian at the Mont Vernon
Village School ("MVVS"), has sued School Administrative Unit #39
("SAU #39") for violations of the Americans with Disabilities
Act (the "ADA") and New Hampshire state law.  Bellerose claims
that SAU #39 violated the ADA by refusing to renew his contract
and later failing to rehire him because he suffers from
Asperger's Disorder.  He bases his state law claims on the
alternative theory that SAU #39 refused to employ him because he
spoke out about health and safety issues at the school.  SAU #39
has challenged Bellerose's claims in a motion for summary
judgment.

I.    BACKGROUND[1]

Bellerose began working as a custodian for MVVS in the fall

---

[1] I recite the facts in the light most favorable to Bellerose.

of 2006.  He reported to Dennis Melanson, the Facilities Manager for the school.  Melanson, in turn, reported to the Building Director, Jim Miner.  In May 2007, Bellerose received an annual performance appraisal (the only one he received), in which he was rated "Outstanding" in eight categories and "Very Good" in three categories, for a total of 52 out of a possible 55 points.

A.   **Oral Reports of Concerns**

From the winter of 2008-2009 through the winter of 2009-2010, Bellerose made a number of oral reports to various people about conditions at MVVS and about Melanson's failure to address those conditions.  For example, in December 2008, Bellerose reported to a firefighter that his supervisor (presumably Melanson, but the facts cited are not more specific) made no attempt to shut off the water supply to the school when the school's power was out for several days.  The firefighter directed Bellerose's supervisor to shut off the water supply.

At other points, Bellerose voiced his concerns about MVVS's maintenance practices to his supervisors and to other governmental employees and members of the public.  For example, he expressed concerns about mold growing on classroom walls, ice dams on the school roof, and Melanson's inadequate response to many maintenance problems.  Bellerose believed that some

2

practices, such as when Melanson set up a fan in front of a moldy wall and when Melanson failed to inspect the smoke alarm system, violated the building rules and the health code.  On two occasions, Bellerose voiced his concerns to his supervisors, Melanson, and Miner.  On other occasions, however, he complained to selectmen, parents, teachers, and members of the fire department and school board.

**B.   <u>Warning Letters to Bellerose</u>**

In a letter dated November 2, 2009, Miner wrote to Bellerose about following a "chain of command" ("Chain of Command Letter").  The letter reprimanded Bellerose for bypassing the chain of command by "cho[osing] to directly voice any thoughts regarding disagreement or criticism" about the school's conditions and maintenance practices to people outside the school.  Doc No. 11-9 at 3.  The letter continued, "It is imperative that all employees, yourself included, follow the established chain of command on all issues and concerns."  <u>Id.</u> Bellerose had never before been told about the chain of command. He nevertheless signed the letter, but wrote "Some Disagreement" beneath his name.

On January 8, 2010, Miner wrote another letter to Bellerose with the subject, "2nd Written Warning."  The letter reprimanded

Bellerose for failing to "complete the task of snow removal" during the 2009-2010 holiday period.  Doc. No. 11-9 at 2.  It stated:

> During discussions of this issue with the Principal and Facility Manager on Monday, January 4th, your responses were belligerent and disrespectful. . . . In October, both you and your supervisor were instructed to have a daily meeting to communicate the routine status and needs of the school.  You have failed to contribute to that effort and chose to not participate in a constructive manner.

Id.  The letter warned that he could be terminated if he did not change his behavior.

Bellerose signed the letter, writing, "Strongly Disagree" beneath his name.  Bellerose was at school on Monday through Friday of the holiday period to clean the school, but it did not snow so there was no need to shovel.  Bellerose did not meet daily with Melanson because Melanson usually left the school before Bellerose arrived at 3:00 p.m.

On February 1, 2010, Miner wrote a letter to Bellerose with the subject, "Final Warning."  While helping a Mont Vernon citizen unload furniture at the school, the letter stated that Bellerose had used "profanity with a hostile tone" in front of the citizen and his eight and ten year-old children.  Doc. No. 11-9 at 1.  The letter warned that "[f]ailure to immediately

correct this [unprofessional] behavior will result in further

action up to and including termination." Id.  The space marked

for Bellerose's signature is blank.  Below it, a handwritten

notation reads, "REFUSED TO SIGN 2/2/10." Id.  Bellerose did

help unload furniture, but he did not use profanity or a hostile

tone during this event.

Following his receipt of the final warning letter,

Bellerose tried to correct the false allegations in the letter.

He asked two people who were at the school when he unloaded the

furniture to record statements about what happened.  John Matte,

another custodian at MVVS who helped unload furniture that

night, wrote a statement in which he denied hearing Bellerose

say anything inappropriate.  Additionally, the basketball coach,

Bill Pike, wrote a letter stating he held a practice at the

school when the furniture was unloaded and he did not hear any

inappropriate language or behavior.  Bellerose provided these

statements to Principal Sue Blair shortly after receiving the

final warning.

**C.    Meetings with Principal Blair**

Bellerose suffers from Asperger's Disorder.[2]   At some point

---

[2] Asperger's Disorder is "a pervasive developmental disorder,
being characterized by severe impairment of social interactions

during the winter of 2009-2010, Bellerose learned that his
disorder potentially qualified as a disability.  He also learned
that communication problems were a symptom of Asperger's
Disorder.  Because he had been criticized for communication
problems in the Chain of Command Letter, he brought information
about the disorder to Principal Blair so that she could help him
avoid issues in the future.  Bellerose handed Blair four pages
of information about Asperger's Disorder from the website
Asperger-advice.com, which described symptoms of Asperger's
Disorder.  Blair responded to the papers by asking, "Is this
you?" to which Bellerose replied, "Yes."  Doc. No. 12-3 at 2.
Blair did not ask any follow-up questions.

    On May 5, 2010, Blair met with Bellerose to inform him that
his contract would not be renewed for the 2010-2011 school year.
During the meeting, Blair said to Bellerose, "Your Asperger's
got in the way of your ability to interact with your boss, and
we are tired of it."  Doc. No. 12-3 at 2.  Miner was also
present at the meeting and told Bellerose that he should have
gone to counseling.  Bellerose's contract expired at the end of

and by restricted interests and behaviors, but lacking the
delays in development of language, cognitive function, and self-
help skills that additionally define autistic disorder."
Dorland's Illustrated Med. Dictionary 1821-22 (32d ed. 2012).

June 2010.

In October 2010, Bellerose filed a complaint with the New Hampshire Commission for Human Rights (the "NHCHR").  In the spring of 2011, Bellerose applied for a part-time custodial position at MVVS.  He was not selected for the position.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A material fact "is one 'that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Prop. with Bldgs., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  If the moving party satisfies this burden, the nonmoving party must then "produce

evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III.   ANALYSIS

Bellerose presents four ADA claims and three state law claims.  Under the ADA, he asserts claims for disability discrimination (Count IV), "regarded as" disability discrimination (Count VII), failure to engage in an interactive process (Count V), and retaliation (Count VI).  Under state law, he asserts a claim under the Whistleblowers' Protection Act (Count I), a claim under the Public Employee Freedom of Expression Act (Count II), and a claim for wrongful termination (Count III).  I begin by addressing SAU #39's challenge to Bellrose's ADA claims.

### A.   ADA Discrimination Based on Actual Disability (Count IV) and Perceived Disability (Count VII)

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove "(1) that []he was 'disabled' within the meaning of the ADA; (2) that []he

8

was able to perform the essential functions of [his] job with or without accommodation; and (3) that []he was discharged or adversely affected, in whole or in part, because of [his] disability." Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012).

SAU #39 argues that Bellrose's actual disability claim fails because he does not have a qualifying disability. See Doc. No. 11-1 at 8-10. It also challenges both Bellerose's actual disability claim and his perceived disability claim on the ground that it did not refuse to renew his contract or rehire him because of his disability. See id. at 10-11, 14-16.

1. Was Bellerose Disabled Within the Meaning of the ADA?

Bellerose has set forth sufficient facts to permit a reasonable juror to conclude that he was disabled while he was employed by SAU #39. He produced an expert report from Dr. Darlene Gustavson based on her February 2014 examinations of him and her review of his medical records. Her report concludes that Bellerose has Asperger's Disorder, an impairment that in his case "substantially limit[s] one or more of his major life activities, including but not limited to: learning, concentrating, thinking, communicating and social interaction." Doc. No. 12-23 at 3. Although the report does not indicate a

specific timeframe during which Bellerose experienced the
impairment, Dr. Gustavson describes various struggles that he
has experienced since childhood as a result of his improvement.

SAU #39 relies on a report from Dr. Joan Scanlon, who saw
Bellerose in March 2010 and determined that he did not have
Asperger's Disorder at that time.  Dr. Scanlon's report may call
Bellerose's claim that he is disabled into question, but it does
not conclusively show that he was not disabled when his contract
was not renewed.  SAU #39 also argues that Bellerose did not
receive a diagnosis until at least December 2010 – six months
after his contract ended with SAU #39.  SAU #39 has not,
however, pointed to any evidence that Bellerose's condition
arose after his contract ended.  Dr. Gustavson's report treats
Asperger's Disorder as a lifelong condition, and SAU #39 has not
dispelled that assumption.  Accordingly, a triable case exists
as to whether Bellerose was disabled when SAU #39 refused to
renew his contract and rehire him.

   2.   Did SAU#39 Refuse to Employ Bellerose Because of
        His Disability?

Bellerose has also produced evidence to support his claim
that his disability (or his employer's belief that he was
disabled) was the reason that his employer refused to renew his

contract or rehire him.  At his termination meeting on May 5, 2010, Principal Blair said to him, "Your Asperger's got in the way of your ability to interact with your boss, and we are tired of it."  Doc. No. 12-3 at 3.  This direct evidence of discriminatory animus is plainly sufficient to satisfy the third element of Bellerose's prima facie case, both with respect to his actual disability claim and his perceived disability claim.

SAU #39 nevertheless argues that it is entitled to summary judgment because it has produced evidence to support its claim that it failed to renew Bellerose's contract and rehire him for reasons unrelated to his disability.  Doc. No. 11-1 at 10-11, 15-16.  This evidence, however, at most gives rise to a genuine dispute as to why it failed to renew Bellerose's contract or rehire him.  It does not entitle SAU #39 to summary judgment. See Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 n.3 (1st Cir. 2000) ("[C]redibility determinations in respect to direct evidence are for a properly instructed jury, not for the judge.").

**B.   Interactive Process Claim (Count V)**

SAU #39 also argues that it is entitled to summary judgment on Bellerose's claim that it failed to engage in an interactive process regarding a reasonable accommodation.  See Doc. No. 11-1

11

at 11-13.  Bellerose argues that he disclosed that he had
Asperger's Disorder and provided Principal Blair with papers
explaining the condition, which should have prompted her to
initiate an interactive dialogue to address his disability.  See
Doc. No. 7-1 at 13-14.  SAU #39 responds that this disclosure
was insufficient to trigger an obligation to initiate an
interactive process.  See Doc. No. 11-1 at 12.

The ADA makes it unlawful for an employer to fail to
reasonably accommodate an employee's known disability.  42
U.S.C. § 12112(b)(5)(A).  To determine whether a proposed
accommodation is reasonable, federal regulations note that "it
may be necessary for [an employer] to initiate an informal,
interactive process with the individual with a disability in
need of the accommodation."  29 C.F.R. § 1630.2(o)(3).  Although
not addressed by statute or regulation, the Equal Employment
Opportunity Commission's interpretive guidance states that an
employer's duty is triggered "[o]nce an individual with a
disability has requested provision of a reasonable
accommodation."  29 C.F.R. pt. 1630, app. § 1630.9.  This
guidance is not controlling, but "constitute[s] a body of
experience and informed judgment to which courts and litigants
may properly resort for guidance."  Grenier v. Cyanamid

Plastics, Inc., 70 F.3d 667, 672 (1st Cir. 1995) (quoting

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

Case law in this circuit explains that "[a] plaintiff must
explicitly request an accommodation, unless the employer
otherwise knew one was needed." Jones v. Nationwide Life Ins.
Co., 696 F.3d 78, 89 (1st Cir. 2012).  "This means not only
notice of a condition, but of a causal connection between the
major life activity that is limited and the accommodation
sought." Id. (internal quotation marks omitted).  Typically,
the ADA's reasonable accommodation requirement is not triggered
until the employee makes a request "[b]ecause an employee's
disability and concomitant need for accommodation are often not
known to the employer until the employee requests an
accommodation." Reed v. LePage Bakeries, Inc., 244 F.3d 254,
261 (1st Cir. 2001).  For example, where an employer told an
employee that she should walk away from altercations with co-
workers and the employee agreed and offered to get a note from
her therapist to that effect, the employer's obligation to
provide a reasonable accommodation was not triggered.  Id. at
255, 261.

Here, even taking the facts in the light most favorable to
Bellerose, he did not sufficiently request a reasonable

13

accommodation.  At most, Bellerose went to Principal Blair's office at some point between receiving his first and final warning letters and handed her four sheets of paper regarding Asperger's Disorder.  According to Bellerose, Blair asked, "Is this you?" referring to Asperger's Disorder, to which Bellerose replied, "Yes."  Doc. No. 12-3 at 2.  Bellerose does not allege that this meeting related in any way to his warning letters or his conduct, nor does he allege that he and Blair discussed the warning letters.  Bellerose does not allege that he asked for any accommodation during this meeting or at any other time during his employment with SAU #39.

Accordingly, I grant SAU #39's motion for summary judgment on Count V.

## C.   **ADA Retaliation (Count VI)**

SAU #39 also moves for summary judgment on Bellerose's retaliation claim.  Bellerose argues that SAU #39 refused to rehire him for the vacant part-time position because he had filed a claim with the Human Rights Commission.  See Doc. No. 12-1 at 18-19.  SAU #39 replies that it did not re-hire Bellerose for legitimate, non-discriminatory reasons.  See Doc. No. 11-1 at 13.

To establish a prima facie case of unlawful retaliation,

Bellerose must establish (1) that he engaged in statutorily
protected activity; (2) that SAU #39 took an adverse employment
action against him; and (3) that a causal connection existed
between SAU #39's action and his activity.  See Collazo-Rosado
v. Univ. of P.R., 765 F.3d 86, 92 (1st Cir. 2014).  If this
prima facie showing is made, the burden of production shifts to
SAU #39 to "offer a legitimate, nonretaliatory reason" for its
action.  See id.  If SAU #39 meets its burden of production, the
burden of proof remains with Bellerose to show that the stated
reason was a mere pretext for unlawful retaliation.  See id.

    Bellerose argues that SAU #39's refusal to rehire him for
the vacant part-time position in the spring of 2011 constitutes
retaliation.  SAU #39 has not challenged the sufficiency of
Bellerose's prima facie case.  Instead, it has responded with a
legitimate, non-retaliatory reason for not rehiring Bellerose.[3]
Thus, the issue presented by SAU #39's challenge to Bellerose's
retaliation claim is whether Bellerose has produced sufficient
evidence to support a finding that SAU #39's stated reason for
its refusal to rehire him was a mere pretext for unlawful

---

[3]  SAU #39 has explained that Bellerose was one of six candidates
considered for the position.  It claims that it ultimately
selected a person who was better qualified for the position than
Bellerose.

15

discrimination.

Although there is "no mechanical formula" to determine whether a proffered reason is a pretext for unlawful retaliation, "[t]he inquiry focuses on whether the employer truly believed its stated reason for taking action adverse to the employee." Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013) (internal quotation marks omitted).  A plaintiff can demonstrate pretext in many ways, including through "evidence of differential treatment in the workplace, statistical evidence showing disparate treatment, temporal proximity of an employee's protected activity to an employer's adverse action, and comments by the employer which intimate a retaliatory mindset." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (internal citations omitted).

Bellerose makes five brief arguments, each of which fails to show that SAU #39's proffered reason was pretextual.  First, he argues that his custodial skills were "excellent."  See Doc. No. 12-1 at 18.  This argument does not address SAU #39's proffered explanation that the selected candidate had supervisory and mechanical skills that made him a better fit for the position.  Second, Bellerose argues that his cover letter explained that his communication problems were due to his

16

Asperger's.  See id. at 18-19.  This argument does not address why SAU #39's proffered reason was a pretext for unlawful retaliation.  Third, he argues that Melanson, Miner, and Blair were each involved in his termination and were also responsible for selecting the new candidate.  See id. at 19.  Simply because the same people were involved in the decisions not to renew and not to rehire, however, is insufficient to show that they had a retaliatory animus.  Fourth, Bellerose argues that "the vacancy was posted  . . . four months after [his] first charge of discrimination was filed," which he argues shows "temporal proximity."  See id.  The timing of the job opening has no bearing on whether SAU #39's proffered reason for not hiring Bellerose was pretextual.  Finally, Bellerose argues that Melanson, Miner, and Blair ranked the candidates and "'probably' knew" that he had filed a discrimination charge.  See id.  An employer's knowledge that an employee has filed a discrimination claim is not, however, enough to demonstrate pretext.  See Mesnick, 950 F.2d at 828-29.

Each of Bellerose's pretext arguments fails as a matter of law.  Accordingly, I grant SAU #39's motion for summary judgment on Count VI.

17

D.   **New Hampshire Whistleblowers' Protection Act (Count I)**

Bellerose alleges that SAU #39 violated the New Hampshire Whistleblowers' Protection Act by refusing to renew his contract and rehire him because of oral reports he made about conditions at the school. See Doc. No. 7-1 at 5. He brings this claim under § 275-E:2 of the New Hampshire Revised Statutes, which provides in part:

> I. No employer shall harass, abuse, intimidate, discharge, threaten, or otherwise discriminate against any employee regarding compensation, terms, conditions, location, or privileges of employment because:
> > (a) The employee, in good faith, reports or causes to be reported, verbally or in writing, what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state, a political subdivision of this state, or the United States . . . .
>
> II. An aggrieved employee may bring a civil suit within 3 years of the alleged violation of this section.

N.H. Rev. Stat. Ann. § 275-E:2.

SAU #39 argues that Bellerose's claim is barred by the three-year statute of limitations to the extent that it is based on the issuance of the warning letters. See Doc. No. 11-1 at 19. It also contends that the entire claim fails because he cannot prove that SAU #39's refusal to renew his contract and rehire him was in retaliation for his health and safety

18

complaints.  See id. at 19-20.  I address each argument in turn.[4]

1.   Statute of Limitations

Although Bellerose alleges in his complaint that SAU #39

issued the warning letters in retaliation for his complaints,

his response to SAU #39's motion for summary judgment asserts

that his whistleblower claim seeks relief only for SAU #39's

refusal to renew his contract and rehire him.  See Doc. No. 12-1

at 20-21.  Accordingly, I need not address SAU #39's argument

that a Whistleblowers' Protection Act claim based on the warning

letters would be barred by the statute of limitations.

2.   Retaliatory Motive

a.  Contract Non-Renewal

To establish a prima facie case under New Hampshire

whistleblower law, a plaintiff must establish that:

> (1) he engaged in an act protected by the
> whistleblowers' protection statute; (2) he suffered
> an employment action proscribed by the whistleblowers'
> protection statute; and (3) there was a causal
> connection between the protected act and the
> proscribed employment action.

In re Seacoast Fire Equip. Co., 146 N.H. 605, 608 (2001).  If

---

[4] SAU #39 also complains that Bellerose's complaint does not
provide enough supporting detail to state a viable claim for
relief.  See Doc. No. 11-1 at 18-19.  I decline to address this
argument because it is not an argument that can be raised by a
motion for summary judgment.

the prima facie case is established, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  Finally, the plaintiff is "given a chance to demonstrate that the employer's proffered reason was actually a pretext."  Id.

Bellerose has established his prima facie case.  First, he verbally reported Melanson's placement of a fan in front of a moldy wall and Melanson's failure to inspect the smoke alarm system, which he reasonably believed were violations of state law.  Second, his employment contract was not renewed, which is an employment action covered by the statute.  Third, Bellerose argues that his failure to follow the "chain of command" was "[t]he material motivation" for SAU #39 not renewing his employment or rehiring him.  See Doc. No. 12-1 at 21.  In the Chain of Command Letter, Bellerose was reprimanded for some of his statements to people outside the school.  Approximately six months later, he was informed that his contract would not be renewed.  These facts are sufficient to support a reasonable inference that his oral reports contributed to SAU #39's decision not to renew his contract.

SAU #39 has responded to Bellerose's claim by presenting a legitimate, nondiscriminatory reason for not renewing his

contract.  Specifically, it said it did not renew his contract
because of his failure to respond to criticism of his
performance in a constructive manner.  Doc. No. 11-1 at 20.
Bellerose, however, has produced sufficient evidence to show
that SAU #39's proffered reason was pretextual.  First, the
Chain of Command Letter informed Bellerose of "an established
protocol for reporting issues and concerns," but Bellerose was
never before informed of such a protocol.  Doc. No. 12-7 at 1.
Second, Bellerose was reprimanded for not shoveling snow over a
holiday break, but it did not snow over that time period.
Third, Bellerose was reprimanded for swearing in front of
children while unloading furniture, but Bellerose did not swear,
and two witnesses wrote statements to Blair corroborating
Bellerose's denial of swearing.  For purposes of summary
judgment, these discrepancies are sufficient to establish that
SAU #39's proffered reason for not renewing Bellerose's contract
was pretextual.

Accordingly, to the extent Bellerose's claim is based on
his non-renewal, I deny SAU #39's motion for summary judgment on
Count I.

3.  Non-Rehire

Bellerose has failed to establish that SAU #39's refusal to

21

rehire him constituted a violation of the New Hampshire
Whistleblowers' Protection Act.  Although he engaged in
protected activity and SAU #39 refused to hire him, he has
failed to sufficiently show causality between the two events.
"[C]hronological proximity does not by itself establish
causality, particularly if the larger picture undercuts any
claim of causation. . . ."  Wright v. CompUSA, Inc., 352 F.3d
472, 478 (1st Cir. 2003) (internal quotation marks omitted).
Here, Bellerose's argument that SAU #39's refusal to rehire him
based on his oral reports is not supported by any evidence other
than a loose sequencing of the events.  This sequencing is
insufficient to establish a prima facie whistleblower claim
where the alleged oral reports occurred more than a year before
the refusal to rehire.  Moreover, unlike the non-renewal of his
contract, Bellerose has not produced any evidence to show that
SAU #39's proffered reason for not rehiring him was pretextual.
Although his janitorial skills may have been "excellent," that
does not rebut the proffered explanation that someone else was
better qualified for the position.  Here, the circumstantial
evidence of weak temporal proximity with no showing of pretext
is insufficient as a matter of law to support a whistleblower
claim.

22

Accordingly, to the extent that Bellerose's claim is based on SAU #39's refusal to rehire him, I grant SAU #39's motion for summary judgment on Count I.

**E.   New Hampshire Public Employee Freedom of Expression (Count II)**

Bellerose alleges that SAU #39 violated his rights as a public employee under chapter 98-E of the New Hampshire Revised Statutes.  Chapter 98-E provides that "a person employed as a public employee in any capacity shall have a full right to publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies." N.H. Rev. Stat. § 98-E:1.  The chapter prohibits a person from "interfer[ing] in any way with the right of freedom of speech, full criticism, or disclosure by any public employee." N.H. Rev. Stat. Ann. § 98-E:2.

Bellerose argues that he was fired and not rehired because of his protected speech to town officials "about the poor performance of his supervisor and related school policies and practices."  See Doc. No. 12-1 at 22.  He argues that SAU #39's refusal to renew his contract and refusal to rehire him constituted impermissible interference with his right to free expression.  See id.  SAU #39 argues that its decisions not to

23

renew Bellerose's contract or rehire him were unrelated to his
complaints in 2008, 2009, and 2010.  See Doc. No. 11-1 at 22.

    1.  Contract Non-Renewal

    Bellerose has alleged sufficient facts to support his claim
that SAU #39 interfered with his freedom of expression.
Specifically, he opined about various school maintenance issues
to selectmen, parents, teachers, and members of the fire
department and school board.  In the November 2009 Chain of
Command Letter, Miner reprimanded Bellerose for voicing his
criticisms "to outside parties."  See Doc. No. 12-7 at 1.
Although the school had consistently renewed his contract in
years prior to the Chain of Command Letter, it did not renew
Bellerose's contract after the Chain of Command Letter.  The
school communicated to Bellerose that his contract would not be
renewed approximately six months after it issued the Chain of
Command Letter.

    Additionally, Bellerose has provided evidence that SAU
#39's proffered reason for not renewing his contract – namely,
his failure to respond constructively to criticisms – was
pretextual.  As discussed above, (1) he was reprimanded for
failing to follow the chain of command protocol, but he had
never been informed of such a protocol; (2) he was reprimanded

24

for not shoveling snow over a holiday break, but it did not snow during that time; and (3) he was reprimanded for swearing in front of children, but he did not swear on the occasion for which he was accused.  For purposes of summary judgment, these facts are sufficient to establish a claim under Chapter 98-E.[5]

## 2. Non-Rehire

Bellerose has failed to set forth facts that would reasonably permit a trier of fact to find that SAU #39's refusal to rehire him constituted interference with his right to freedom of expression.  Again, the only support for his claim is a loose sequencing of the events in which the alleged oral reports occurred more than a year before the refusal to rehire.  He has offered no argument or evidence to show that SAU #39's proffered reason for not rehiring him was pretextual.  SAU #39 stated that

---

[5] I note that there are certainly legitimate reasons for employers to establish chain of command protocols.  The text of RSA chapter 98-E, however, does not appear to allow an exception to its broad employee protections for such protocols.  The only exception it provides to the "full right to publicly discuss and give opinions as an individual on all matters concerning any government entity and its policies" is for "legitimate confidential records, communications, and proceedings."  N.H. Rev. Stat. Ann. § 98-E:1; see Appeal of Booker, 139 N.H. 337, 340-41 (1995) (recognizing that Chapter 98-E overruled the New Hampshire Supreme Court's decision in Bennett v. Thomson, 116 N.H. 453 (1976), which had applied a balancing test weighing the employee's interest in expression against the interest of the state in promoting efficiency).

it selected a candidate with mechanical skills and supervisory experience for the position.  Bellerose's "excellent" janitorial skills do not establish that he was more qualified than the selected candidate.

Accordingly, to the extent Count II is based on SAU #39's refusal to rehire Bellerose, summary judgment is granted.  To the extent that it is based on the non-renewal of his contract, however, summary judgment is denied.

**F.  <u>Wrongful Termination (Count III)</u>**

Bellerose brings a claim for wrongful termination, alleging that SAU #39 refused to renew his contract because of the oral reports he made to third parties.  <u>See</u> Doc. No. 7-1 at 6.  To prove a claim for wrongful termination under New Hampshire common law, a plaintiff must establish: (1) "that the employer terminated the employment out of bad faith, malice, or retaliation" and (2) "that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn."[6]  Short v. Sch. Admin. Unit

---

[6] SAU #39 argues that an employee with a written contract is barred from bringing a wrongful termination claim.  <u>See</u> Doc. No. 11-1 at 16.  This misunderstands New Hampshire law and the facts of this case.  In this case, SAU #39 has not produced the

No. 16, 136 N.H. 76, 84 (1992).

    1.  <u>First Element</u>

    The first element of a wrongful termination claim requires the plaintiff to show "that the employer terminated the employment out of bad faith, malice, or retaliation." Short, 136 N.H. at 84. Here, taking the evidence in the light most favorable to Bellerose, the record supports his contention that SAU #39 terminated his employment to retaliate for his oral reports. As discussed above, Bellerose made statements to many

---

contract, but both sides agree that Bellerose's employment did not end until the contract expired. Bellerose bases his claim on SAU #39's refusal to renew his contract rather than a breach of the contract. See Doc. No. 12-1 at 22-23.

    Although the New Hampshire Supreme Court has not yet conclusively decided whether a wrongful termination claim can be based on a failure to renew a contract, it has suggested on more than one occasion that such claims are allowable under New Hampshire law. See Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998) (rejecting an intentional infliction of emotional distress claim, but noting that the non-renewal of an employment contract "may support a claim for wrongful termination"); Short, 136 N.H. at 85-86 (rejecting a wrongful termination claim based on a contract non-renewal because the plaintiff failed to establish the public policy prong). But see Touchstone Television Prods. v. Super. Ct., 145 Cal. Rptr. 3d 766, 767 (Cal. Ct. App. 2012) (no such cause of action under California law); Willitts v. Roman Catholic Archbishop of Bos., 581 N.E.2d 475, 479 (1991) (same under Massachusetts law); Leuthans v. Wash. Univ., 894 S.W. 2d 169, 172 (Mo. 1995) (same under Missouri law). This issue has not been briefed by the parties. Accordingly, I am not prepared to dismiss this claim merely because it is premised on non-renewal of a contract rather than on the termination of an existing contract.

individuals outside the school that criticized school maintenance.  SAU #39 reprimanded him in the Chain of Command Letter for making those statements, and approximately six months later, it decided for the first time not to renew his employment contract.  Bellerose has supplied evidence showing that SAU #39's proffered reason for not renewing his contract was pretextual.  At this stage, this evidence is sufficient to establish that SAU #39 terminated Bellerose's employment out of retaliation.

    2.  <u>Second Element</u>

The second element of a wrongful termination claim requires the plaintiff to show "that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn."  <u>Short</u>, 136 N.H. at 84. Here, SAU #39 has not challenged the public policy element and therefore I do not address it.

Accordingly, I deny SAU #39's motion for summary judgment on Count III.


                           **IV.   CONCLUSION**

For the reasons set forth above, I grant defendants' motion

28

to dismiss (Doc. No. 11) in part and deny it in part.  The
claims that remain are: (1) ADA discrimination based on
disability (Count IV); (2) ADA discrimination based on being
"regarded as" having a disability (Count VII); (3) New Hampshire
Whistleblowers' Protection Act (Count I); (4) New Hampshire
Public Employee Freedom of Expression (Count II); and (5)
wrongful termination (Count III).

        SO ORDERED.


                            /s/Paul Barbadoro
                            Paul Barbadoro
                            United States District Judge

December 29, 2014

cc:   Nancy Richards-Stower
      Charles P. Bauer